Filed 5/27/15  L.W. v. Super. Ct. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| L.W.,<br><br>        Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF CONTRA COSTA COUNTY,<br><br>        Respondent;<br><br>CONTRA COSTA COUNTY CHILDREN AND FAMILY SERVICES BUREAU,<br><br>        Real Party in Interest. | A144688<br><br>(Contra Costa County<br>Super. Ct. No. J14-00182) |

Petitioner L.W.  (Mother), mother of 15-month-old E.P. seeks review by extraordinary writ, pursuant to California Rules of Court, rule 8.452,[1] of the juvenile court's findings and orders, in which the court terminated reunification services and set the matter for a permanency planning hearing, pursuant to Welfare and Institutions Code section 366.26.[2]  Mother contends (1) the juvenile court abused its discretion when it terminated Mother's reunification services, and (2) the court should have extended reunification services because the Contra Costa County Children and Family Services

---

[1] All further rule references are to the California Rules of Court.

[2] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

1

Bureau (Bureau) did not provide reasonable services. We shall deny the petition for extraordinary writ.

## FACTUAL AND PROCEDURAL BACKGROUND

On February 20, 2014, the Bureau filed an original petition alleging that E.P. came within the provisions of section 300, subdivision (b). Specifically, the petition alleged that Mother's substance abuse and "undiagnosed mental health illness" had impaired her ability to provide regular care for E.P.

In the detention/jurisdiction report filed on February 21, 2014, the Bureau reported that, at the time of E.P.'s birth, she and Mother had tested positive for amphetamines, marijuana, and opiates.[3] Mother, who admitted to taking the street drug Adderall, had not received proper prenatal care, had been homeless, and reported that she was physically abused by E.P.'s father. She also had a two-year-old child, K.W., who was being cared for by the paternal grandmother. Mother also told a social worker that she had undiagnosed mental health problems.

The Bureau arranged for Mother to enter a local inpatient substance abuse rehabilitation program with E.P. Although Mother entered the program on February 4, 2014, within a few days, she told the social worker that she did not believe the program was right for her and that she missed her older daughter. The social worker arranged for Mother to transfer to another program that would allow K.P. to join mother and E.P. after two weeks. Mother entered the new program on February 10. On February 16, the social worker learned that Mother had been discharged from that program for violating the program rules, including using inappropriate language, being disrespectful to staff, and kicking a door. On February 18, the social worker met with Mother at the paternal grandmother's house and explained that she would be filing a petition in the juvenile court.[4]

On February 21, 2014, the juvenile court ordered E.P. detained.

---

[3] The report noted that hospital staff gave Mother the opiates.

[4] The Bureau also filed a petition as to Mother's older daughter, K.P.

On March 5, 2014, the juvenile court sustained the petition and took jurisdiction over E.P., pursuant to the parties' stipulation.

In the disposition report filed on May 28, 2014, the social worker reported that E.P. and K.P. had been removed from the paternal grandmother's home after it was determined that she had criminal and child welfare histories that she had not disclosed. Both children were now in foster care. E.P. was three months old, and her pediatrician reported that she was "not developing as she should." Mother had her first supervised visit on April 4, 2014, during which she was nurturing and interacted appropriately with both children. During a visit on April 15, mother appeared to be under the influence of an unknown substance, and her emotions fluctuated between extreme agitation and remorse.

Mother had previously received services beginning in November 2013, during her pregnancy with E.P., when she was found to be living in a wrecked car with K.P. and tested positive for methamphetamine. She also had several prior misdemeanor and felony convictions for, inter alia, petty theft, grand theft, and prostitution.

Mother had entered and been unsuccessful in three drug rehabilitation programs—two inpatient and one outpatient—in the previous three months. She had submitted to three random drug tests, and tested positive for cocaine, methamphetamine, and marijuana on April 7; for methamphetamine and marijuana on April 11; and for methamphetamine, cocaine, and opiates on April 14. She was then referred to another inpatient substance abuse treatment program, but she instead took a job, working six days a week in Santa Clara County. Mother appeared to believe that, by attending Narcotics Anonymous/Alcoholics Anonymous (NA/AA) meetings, she was "significantly addressing her substance abuse issues."

The Bureau recommended that reunification services be provided to Mother as well as to E.P.'s presumed father.[5]

At the May 28, 2014 disposition hearing, the juvenile court ordered out of home placement and reunification services for Mother and the presumed father. Mother's case plan included completion of a mental health assessment, participation in individual counseling, completion of a parenting education class, successful participation in an NA/AA program, completion of an inpatient substance abuse treatment program, and participation in random drug/alcohol testing, with all test results being negative.

In the six-month status review report prepared on November 14, 2014,[6] the social worker related that Mother had "made minimal strides in her motivation and efforts towards sobriety." She had regularly attended a 12-step program between April and July, had participated in and completed job readiness workshops, and had also enrolled in parenting classes and an outpatient day program in August, but had provided no proof of completion.

Mother had failed to show up for any of the eight required random drug tests in July or August 2014. On four dates between September and November, she did test, but tested positive for alcohol. She claimed these results were inaccurate because she never drinks alcohol. She also tested positive for cocaine on October 30. On October 27, she was accepted into an inpatient drug treatment program but, on November 7, she self-discharged due to conflicts with other residents. The social worker opined that Mother did not take responsibility for her positive drug tests and had done very little to meet her case plan requirements. Instead of enrolling in another inpatient substance abuse program, she enrolled in school full-time, stating that, "in order to stay sober, she needs to keep busy and school would keep her engaged."

---

[5] The social worker reported that E.P.'s presumed father was in custody on a parole hold for drug-related charges. He seemed to have issues with substance abuse and abiding by the law.

[6] The report was not filed until March 9, 2015, due to the continuance of the six-month hearing that had originally been set for January 21, 2015.

4

Mother had regularly participated in twice per month supervised visits with both children, during which she was "appropriate, loving, and affectionate." According to the social worker, nine-month-old E.P. "presents as a very happy and joyful baby. She appears to be meeting all age appropriate, cognitive and developmental milestones. There are concerns, however, with some physical issues; in early infancy, her legs were very rigid, and in more recent months it has been observed that her legs have become very limp, and unable to support any weight."

In light of Mother's failure to address her drug and alcohol abuse, including failure to comply with testing and failure to receive treatment, the Bureau recommended that the juvenile court terminate her reunification services, and set a section 366.26 hearing.[7]

On January 21, 2015, the social worker filed a memorandum, in which she provided updated information and requested that the six-month hearing be continued so that important pending issues related to K.P.'s birth certificate and "the emerging concurrent plan for [E.P.] with relatives" could be resolved. The social worker reported that it had been determined that E.P. was exhibiting a 33 percent delay in the development of her gross motor skills, and that she was receiving physical therapy. Four relatives had expressed an interest in providing a permanent home for E.P. if Mother was unable to reunify, and were still being assessed.

Mother's visits had been increased to once a week. Mother had twice completed random drug testing, between November 2014 and December 2015, and had tested negative for all substances on both occasions, but had failed to test four times in December and January.

The juvenile court continued the contested review hearing until March 9, 2015, and in the status review report filed on that date, the social worker reported that Mother had "shown little improvement or progress on the elements of her case plan." She had entered another residential substance abuse treatment program in late January, but had

---

[7] As to the half sibling, K.P. the Bureau recommended termination of Mother's reunification services and continuation of the father's reunification services.

been asked to leave the program several days later due to her passing items through the yard fence with her boyfriend, in violation of the program's rules. On January 27, the social worker met with Mother, who became distraught when she learned she could not return to the program and have E.P. placed with her there. After that meeting, Mother had contacted the social worker only twice, and had become verbally abusive during one of those calls. Since then, it had been difficult for the social worker to make contact with Mother.

One of the four relative applications for placement of E.P. had been approved: a local married couple that would be able to facilitate visitation with Mother, transport E.P. to appointments and visits, and was committed to adopting E.P. The Bureau anticipated placing E.P. with that family in early March 2014, following a series of transition visits.

Mother was not in compliance with any of the components of her case plan, including counseling/mental health, substance abuse, and education services. She had, however, been consistent, appropriate, loving, and affectionate in her weekly visits with E.P. Mother seemed unable or unwilling to accept any assistance from the Bureau except for visitation and transportation tickets. The social worker did not believe Mother had the insight to address her substance abuse issues. The social worker further observed that, as of March 5, 2015, the case had reached the 12-month stage. The Bureau recommended that the court terminate Mother's reunification services and set the matter for a section 366.26 hearing.[8]

At the combined six- and twelve-month review hearing, which took place on March 9, 2015, Mother was initially present, but left the courtroom when the juvenile court awarded custody of K.P. to her father, who resided in Illinois. The court denied the request of Mother's counsel to continue E.P.'s matter due to Mother's absence, given that Mother had "just jumped up and hustled out of the courtroom" as the court started to

---

[8] The Bureau also recommended that the court terminate the reunification services of E.P.'s presumed father. It further recommended that Mother's reunification services be terminated as to K.P., and that the court order custody of K.P. to her father and dismiss that case.

make its ruling regarding K.P. In addition, two of the court's support people had gone out after her and the court took a 15-minute break after K.P.'s case "to allow everyone to try to find her."

Mother's counsel then submitted some documents to the court, which included a letter and three certificates for completion of parenting classes and NA/AA meeting attendance records. Mother's counsel argued that Mother had made "significant efforts" during this last period, attending many NA/AA meetings in September, October, and November, and completing two parenting classes. Counsel further argued that Mother's relationship with E.P. was very positive and Mother had visited regularly. Counsel therefore requested that the court extend reunification services as to E.P. Counsel for the Bureau, counsel for E.P., and counsel for E.P.'s father asked the court to follow the Bureau's recommendations, terminate reunification services, and set the matter for a section 366.26 hearing.

In its ruling, the juvenile court followed the Bureau's recommendations, explaining that Mother "puts on a front and shows up at places, but she's not doing what's needed. She's been in five inpatient programs and either kicked out or quit in the last period of time. She's not testing. And when she tests, she's positive for amphetamines. It's just not working for her. And she either doesn't have the ability or doesn't have the motivation to fix what needs to be fixed. [¶] This child needs permanence. Mother's had a chance, she's had plenty of chances. She can't do it. . . ." The court then set the matter for a June 29, 2015 section 366.26 hearing.[9]

On March 16, 2015, Mother filed a notice of intent to file writ petition.[10]

---

[9] At the hearing, the juvenile court also terminated reunification services for E.P.'s presumed father. The court granted legal and physical custody of K.P. to her father and vacated the dependency.

[10] On April 20, 2015, Mother filed a petition seeking review of the juvenile court's orders and requesting a stay of the section 366.26 hearing pending determination of this petition. On April 24, we denied Mother's request for a stay.

7

## DISCUSSION

### I. *Termination of Reunification Services*

Observing that the "focus" of California's dependency provisions "shall be on the preservation of the family as well as the safety, protection, and physical and emotional well-being of the child" (§ 300.2), Mother contends the juvenile court abused its discretion when it terminated her reunification services.

Section 361.5, subdivision (a)(1)(B), which governs the provision of reunification services, provides that, "[f]or a child who, on the date of initial removal from the physical custody of his or her parent or guardian, was under three years of age, court-ordered services shall be provided for a period of six months from the dispositional hearing . . . but no longer than 12 months from the date the child entered foster care . . . unless the child is returned to the home of the parent or guardian." Subdivision (a)(3) of that section further provides that "court-ordered services may be extended up to a maximum time period not to exceed 18 months after the date the child was originally removed from physical custody of his or her parent or guardian if it can be shown . . . that the permanent plan for the child is that he or she will be returned and safely maintained in the home within the extended time period. The court shall extend the time period only if it finds that there is a substantial probability that the child will be returned to the physical custody of his or her parent or guardian within the extended time period or that reasonable services have not been provided to the parent or guardian. . . . The court shall also consider, among other factors, good faith efforts that the parent or guardian has made to maintain contact with the child." (Accord, § 366.21, subd. (g).)

"[T]o find a substantial probability that the child will be returned to the physical custody of his or her parent or legal guardian and safely maintained in the home within the extended period of time, the court shall be required to find all of the following:

"(A) That the parent or legal guardian has consistently and regularly contacted and visited with the child.

"(B) That the parent or legal guardian has made significant progress in resolving problems that led to the child's removal from the home.

"(C)  The parent or legal guardian has demonstrated the capacity and ability both to complete the objectives of his or her treatment plan and to provide for the child's safety, protection, physical and emotional well-being, and special needs."  (§ 366.21, subd. (g)(1); accord, rule 5.715(b)(4)(A)(i).)

As this statutory scheme demonstrates, "the presumptive rule for children under the age of three on the date of initial removal is that 'court-ordered services shall not exceed a period of six months from the date the child entered foster care.'  (§ 361.5, subd. (a)(2); [citation].)"  (*M.V. v. Superior Court* (2008) 167 Cal.App.4th 166, 174-175.)  This rule recognizes that the unique developmental needs of such young children "justifies a greater emphasis on establishing permanency and stability earlier in the dependency process ' "in cases with a poor prognosis for family reunification." '  [Citation.]"  (*Id.* at p. 175.)

"We review the juvenile court's findings for substantial evidence, and the juvenile court's decisionmaking process based on those findings for abuse of discretion. [Citation.]"  (*San Joaquin Human Services Agency v. Superior Court* (2014) 227 Cal.App.4th 215, 223 (*San Joaquin Human Services Agency*).)

Here, contrary to Mother's assertion, the evidence does *not* support a finding that an additional six months of reunification services were warranted because there was a substantial probability that E.P. would be returned and safely maintained in the physical custody of Mother within the extended time period.  (See § 361.5, subd. (a)(3).)[11] Although the evidence shows that Mother consistently and regularly visited with E.P. (see § 366.21, subd. (g)(1)(A)), it also shows that she failed to either make significant progress in resolving the problems that led to the dependency or demonstrate the ability

_____

[11] The record in this case reflects that, by the time of the March 9, 2015 hearing, Mother had received over nine months of reunification services and the jurisdictional hearing had taken place over one year earlier.  In these circumstances, although the contested review hearing was described as "a combined twelve- and six-month hearing," the rules and standards relevant to a 12-month review were applicable.  (See §§ 361.5, subd. (a)(3); 366.21, subd. (g)(1); & 361.49.)

to complete the objectives of her treatment plan and to provide for E.P.'s safety and well-being.  (See § 366.21, subd. (g)(1)(B) & (C).)

It is true, as Mother notes in her petition, that she had documentation showing that she had completed two parent education courses and had attended more than 60 NA/AA meetings over an eight-month period, between April 11, 2014 and December 2, 2014.  There was no evidence, however, that she had attended such meetings in the three months before the March 9, 2015 hearing.  In addition, Mother had either left or been discharged from at least five different substance abuse treatment programs.  With respect to drug testing, although she had had two negative drug tests between November and December 2014, she failed to test four times between December 2014 and January 2015.  This evidence shows that, by the time of the contested review hearing, Mother had neither made significant progress in resolving her substance abuse issues nor demonstrated the ability to complete the objectives of her treatment plan, which included, inter alia, staying sober and drug-free and demonstrating the ability free from alcohol or drug dependency, as well as complying with all required drug tests.  (See § 366.21, subd. (g)(1)(B) & (C).)[12]

The evidence thus supports the finding that there was not a substantial probability that, if Mother were given an additional six months of services, E.P. would be returned and safely maintained in the physical custody of Mother within the extended time period.  (See § 361.5, subd. (a)(3).)  As the juvenile court found at the conclusion of the contested review hearing, Mother "either doesn't have the ability or doesn't have the motivation to fix what needs to be fixed.  [¶]  This child needs permanence.  Mother's had a chance, she's had plenty of chances.  She can't do it."

Mother clearly cares for E.P. and has been a loving, positive presence in E.P.'s young life during their visits.  But it is also clear that Mother has remained unable or unwilling to do the work required—particularly in the area of substance abuse

---

[12] In part II, *post*, of this opinion, we will further discuss the mental health assessment/counseling component of Mother's case plan.

10

treatment—to regain custody of her daughter.  As the appellate court stated in *San Joaquin Human Services Agency*, *supra*, 227 Cal.App.4th at page 225:  "We recognize denying or terminating reunification services can be heart wrenching.  But 'in order to prevent children from spending their lives in the uncertainty of foster care, there must be a limitation on the length of time a child has to wait for a parent to become adequate.'  [Citation.]"

Because its findings were supported by substantial evidence, the juvenile court did not abuse its discretion when it terminated reunification services and set the matter for a section 366.26 hearing.  (See *San Joaquin Human Services Agency*, *supra*, 227 Cal.App.4th at p. 223.)

## II. *Reasonable Services*

Mother contends the trial court should have extended reunification services because the Bureau did not provide reasonable services, specifically the mental health assessment that was required by her case plan.  (See § 361.5, subd. (a)(3) [juvenile court must extend the time period for reunification services if it finds, inter alia, that reasonable services have not been provided to parent]; accord, § 366.21, subd. (g)(1)(C).)

Respondent counters that Mother forfeited this issue by failing to raise it in the juvenile court since dependency matters are not exempt from the rule that "a reviewing court ordinarily will not consider a challenge to a ruling if an objection could have been but was not made in the trial court," the purpose of which "is to encourage parties to bring errors to the attention of the trial court, so that they may be corrected."  (*In re S.B.* (2004) 32 Cal.4th 1287, 1293.)  While application of the forfeiture rule is not automatic, "the appellate court's discretion to excuse forfeiture should be exercised rarely and only in cases presenting an important legal issue.  [Citations.]  Although an appellate court's discretion to consider forfeited claims extends to dependency cases [citations], the discretion must be exercised with special care in such matters.  'Dependency proceedings in the juvenile court are special proceedings with their own set of rules, governed, in general, by the Welfare and Institutions Code.'  [Citation.]  Because these proceedings

involve the well-being of children, considerations such as permanency and stability are of paramount importance.  [Citation.]"  (*Ibid*.)

We agree with respondent that, in the circumstances of this case, Mother has forfeited this issue by failing to raise it first in the juvenile court.  (See *In re S.B.*, *supra*, 32 Cal.4th at p. 1293.)

## DISPOSITION

The petition for extraordinary writ is denied on the merits.  Our decision is final as to this court immediately.  (Rule 8.490(b)(2)(A).)

_____
Kline, P.J.

We concur:

_____
Richman, J.

_____
Stewart, J.